878 A.2d 687

**Damont Isaiah GIDDINS**

v.

**STATE of Maryland.**

**No. 2062, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

July 12, 2005.

Ronald I. Kurland, Baltimore, for Appellant.

Brian S. Kleinbord (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: SALMON, MEREDITH, and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge (retired, specially assigned).

The appellant, Damont Isaiah Giddins, went on trial on July 6, 2004, before a Worcester County jury for the possession of cocaine with the intent to distribute. In the course of the direct examination of the State's first witness, the trial judge granted the appellant's motion for a mistrial.

On July 8, the State requested that the case be docketed for retrial. On July 23, the appellant interposed the plea in bar of double jeopardy. Argument was held on the appellant's dou-

ble jeopardy plea before Judge Thomas C. Groton, III, on September 13. On September 16, Judge Groton issued an Opinion and Order, denying the double jeopardy plea. This appeal followed.

### Setting the Doctrinal Stage

As we affirm Judge Groton, answering the appellant's single contention is easy. What is more problematic is putting the question itself into an intelligible context. We are dealing with an esoteric nuance of double jeopardy law. What we said, as we examined very thoroughly this same nuance a quarter of a century ago in *West v. State,* 52 Md.App. 624, 625, 451 A.2d 1228 (1982), is equally pertinent as we take up the present appeal.

We are here called upon to explore a secluded but exotic corner of the double jeopardy garden—*prosecutorial and judicial overreaching.* In life, it *is seldom seen except as an imagined possibility in the most painstakingly thorough of footnotes.* As a contention, however, it is in luxuriant vogue and is being resorted to promiscuously.

(Emphasis supplied).

██ There are layers of double jeopardy law that must be peeled away before we can get to the arcane little problem of the permissibility of a retrial following the declaration of a mistrial at the request of a defendant. An initial hurdle is that there are four widely divergent forms of double jeopardy law and that what is before us is the rarest and most recently evolved of these. In *Fields v. State,* 96 Md.App. 722, 725, 626 A.2d 1037 (1993), we looked initially at the larger genus.

When dealing with a generic category or *portmanteau* phenomenon such as double jeopardy, *it is indispensable* at the outset *to identify the particular species of double jeopardy being invoked.* There are no less than four such species within the genus "double jeopardy." Each carries with it a different history; each serves a different purpose; each has different implementing rules. *The broad umbrella term we call "double jeopardy"* today *embraces* (in its federal manifestation) four distinct species: 1) classic for-

mer jeopardy, arising out of the common law pleas at bar of *autrefois convict* and *autrefois acquit;* 2) simultaneous jeopardy, involving largely issues of merger and multiple punishment and lying on the at-times blurred boundary between constitutional law and statutory construction; 3) *the problem of retrial following mistrial;* and 4) collateral estoppel.

(Emphasis supplied). See also *Tabbs v. State,* 43 Md.App. 20, 21, 403 A.2d 796 (1979).

Zooming in more closely, the particular species of the larger genus that is before us is that of retrial following mistrial. This species was brought into the double jeopardy fold late in the day in an essentially haphazard way. In a scholarly dissenting opinion in *Crist v. Bretz,* 437 U.S. 28, 40–53, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978), Justice Powell traced perceptively the history of what had once been "a separate rule of English practice," 437 U.S. at 41, 98 S.Ct. 2156, through its "rather unreflective incorporation ... into the guarantee against double jeopardy." 437 U.S. at 46, 98 S.Ct. 2156. Justice Powell attributed this aspect of English practice to Lord Coke and demonstrated that "this rule arose as an aspect of jury practice, rather than as an element of the guarantee against double jeopardy." 437 U.S. at 41, 98 S.Ct. 2156. He cited the leading English cases and reported that they had "refused to import the rule into the realm of pleas in bar, and it was the latter which informed the framing of the Double Jeopardy Clause." 437 U.S. at 43, 98 S.Ct. 2156. Justice Powell also pointed out how the seminal decision of *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), wherein the Supreme Court first employed Lord Coke's rule of English practice, did not remotely suggest that the procedural protection was based upon any double jeopardy consideration. He characterized *"Perez* as [an] independent rule barring needless discharges." *Crist,* 437 U.S. at 44, 98 S.Ct. 2156.

In searching for the source of the uncritical doctrinal leap, Justice Powell showed how some American state courts during the 19th century placed Lord Coke's rule "under the rubric of

the Double Jeopardy Clause" but that they did so "with no apparent awareness of the novelty of their action." *Crist*, 437 U.S. at 46, 98 S.Ct. 2156. After tracing this "unreflective incorporation of a common-law rule of jury practice into the guarantee against double jeopardy" in the state courts, *id.*, Justice Powell pinpointed 1949 as the moment the Supreme Court fell into the same unthinking error:

> It was after more than a century of development in state courts that the 'defendant's valued right to have his trial completed by a particular tribunal' appeared in the decisions of this Court for the first time, also without analysis, as an element of the Double Jeopardy Clause. *Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949).

*Crist*, 437 U.S. at 47, 98 S.Ct. 2156. Justice Powell observed that the Supreme Court did this "almost without articulated thought." *Id.* See *West v. State*, 52 Md.App. at 628, 451 A.2d 1228 ("[This] expansion of double jeopardy law occurred late in the evolution of that law and occurred largely subconsciously, as an historic accident.").

In *Fields v. State*, 96 Md.App. at 727, 626 A.2d 1037, this Court appraised what Justice Powell had shown to be the Supreme Court's 1949 mistake and the danger of confusion flowing from it.

> For better or for worse, it is done. "The moving finger writes and, having writ, moves on." However shadowy its constitutional pedigree may be, Lord Coke's rule dealing with retrials following mistrials is now inextricably ensconced in the federal family of protections known generically as "double jeopardy." *It will nonetheless be prudent not to intone too readily generalized pronouncements about double jeopardy law but to remember carefully that many of the incidents of this discrete branch of it are unique to this species alone.*

(Emphasis supplied).

### Initial Jeopardy As the Sine Qua Non of Double Jeopardy

 A tell-tale characteristic of just how unique the mistrial/retrial variety of double jeopardy actually is can be found in

its total nondependence on the traditional double jeopardy concept that initial jeopardy only attaches with the actual rendering of a verdict. There cannot, by definition, be second or double jeopardy until there has been first or initial jeopardy. See *West v. State*, 52 Md.App. at 626, 451 A.2d 1228 ("Before we can even consider double jeopardy, we must first establish single jeopardy."). At the common law, there was no jeopardy until the moment that a verdict was rendered. In *Fields v. State*, 96 Md.App. at 727–28, 626 A.2d 1037, we explained how the other three varieties of double jeopardy are still only triggered by the rendering of a verdict and the resulting attachment of initial jeopardy.

*In classic double jeopardy law, the triggering event of jeopardy occurred only as a verdict was rendered.* Only then had the historic event taken place which could support a plea of *autrefois acquit* or *autrefois convict*. The plea in bar to a second or subsequent jeopardy was, by definition, contingent upon the happening of the earlier jeopardy, to wit, the rendering of the earlier verdict.

In what is now the second species of double jeopardy law, that prohibiting multiple punishment for the same offense in the context of simultaneous jeopardies, *the danger of multiple punishment does not arise,* even potentially, *until the rendering of the verdicts* and does not arise, actually, until the imposition of sentence. *There is no possibility of merging convictions for lesser included offenses into convictions for greater included offenses until verdicts of conviction have been rendered.*

In the case of the fourth species of double jeopardy law, collateral estoppel, *the very issue of estoppel cannot arise until there has been a verdict on the ultimate merits necessarily litigating a particular issue of fact. That necessary finding of fact manifested by a verdict is the estopping instrumentality.* Until that moment, there is no predicate for collateral estoppel.

(Emphasis supplied).

 It is still the firm position of the common law, both in England and in Maryland, that jeopardy only attaches with

the rendering of a verdict. *Queen v. Charlesworth,* 1 B. & S. 460, 500, 121 ER 786, 801 (QB 1861); *Winsor v. Queen,* LR 1 QB 289, 390 (1866); *Hoffman v. State,* 20 Md. 425, 433–34 (1863); *State v. Shields,* 49 Md. 301, 303–04 (1878); *Gilpin v. State,* 142 Md. 464, 121 A. 354 (1923). It is for this reason that mistrial/retrial law, albeit now a part of the federal constitutional law of double jeopardy under the Fifth Amendment, has never been included within the coverage of the Maryland common law of double jeopardy. As Judge Eldridge stated for the Court of Appeals in *Cornish v. State,* 272 Md. 312, 316 n. 2, 322 A.2d 880 (1974):

> The view *in this state* was that, under the common law's double jeopardy prohibition, *jeopardy did not attach until the rendition of a verdict* and that, therefore, *a retrial following the declaration of a mistrial did not give rise to a double jeopardy problem.*

(Emphasis supplied). See also *Kyle v. State,* 6 Md.App. 159, 250 A.2d 314 (1969); *Boone v. State,* 3 Md.App. 11, 23–25, 237 A.2d 787 (1968).

█ The declaration of a mistrial, of course, occurs before the jury has rendered its verdict. Under the Maryland common law of double jeopardy,[1] such a mistrial could not (and still cannot) trigger a double jeopardy issue. There never having been initial jeopardy in Maryland, a retrial cannot represent double jeopardy. Once *Wade v. Hunter, supra,* uncritically treated mistrial/retrial law as an aspect of double jeopardy, therefore, it became logically compelling to move the attachment of jeopardy back to an earlier stage. That aberra-

---

1. Maryland, of course, has no constitutional prohibition against double jeopardy. *Hagez v. State,* 131 Md.App. 402, 422, 749 A.2d 206 (2000) ("Maryland is one of only a few states that 'has no constitutional bar against placing a defendant twice in jeopardy.'"); *West v. State,* 52 Md.App. at 626, 451 A.2d 1228 ("Maryland, we need to remind ourselves periodically, has no constitutional bar against placing a defendant twice in jeopardy."); *Bell v. State,* 286 Md. 193, 201, 406 A.2d 909 (1979) ("There is no provision concerning double jeopardy in the Constitution of Maryland."); *Bennett v. State,* 229 Md. 208, 212, 182 A.2d 815 (1962).

tional relocation of initial jeopardy was a federal phenomenon alone and has nothing to do with Maryland law.

■ It is, however, now the unquestioned federal law, and the controlling law in the present case, that the magic moment when jeopardy begins is the instant in which the jury is sworn. *Crist v. Bretz,* 437 U.S. at 37–38, 98 S.Ct. 2156.[2] In the present case, Fifth Amendment jeopardy had attached when the trial judge declared the mistrial. The issue before Judge Groton, therefore, was legitimately one of constitutional double jeopardy. However questionable its pedigree, the mistrial/retrial issue is properly before us in this case.

### Marching to a Different Drum

■ In yet another respect has mistrial/retrial law been a unique member, indeed a foundling, within the double jeopardy family. It serves a different purpose than those served by its latter-day siblings. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), is the standard statement of the multiple purposes served by the Double Jeopardy Clause.

> That guarantee has been said to consist of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.

That is an articulate statement of the purposes served by the former jeopardy species of double jeopardy law, with respect to both its former acquittal subdivision and its former conviction subdivision. The third of *North Carolina v.*

---

**2.** As Justice Powell lamented in his *Crist v. Bretz* dissent, 437 U.S. at 40, 98 S.Ct. 2156:

> *The rule* that jeopardy attaches in a jury trial at the moment the jury is sworn is not mandated by the Constitution. It *is the product of historical accident, embodied in a Court decision without the slightest consideration of the policies it purports to serve.*
> (Emphasis supplied).

*Pearce's* stated purposes also well expresses the end served, both in a sequential jeopardy setting and a simultaneous jeopardy setting, when we carefully parse the elements of two or more nonidentical offenses, after conviction and before sentencing, to make certain that we do not subject a convicted defendant to multiple punishments for the "same offense."

That statement of purpose from *North Carolina v. Pearce*, and its regular incantation in virtually every double jeopardy case that has followed, has nothing remotely to do with the very different purpose served by mistrial/retrial law. In *Fields v. State*, 96 Md.App. at 731, 626 A.2d 1037, we examined the origin and the very different purpose of mistrial/retrial law.

The purpose of the mistrial/retrial species of double jeopardy law is certainly not to preserve the finality of an acquittal or a conviction because there is no acquittal or conviction to be afforded finality. Nor is it the purpose of this species of the law to avoid multiple punishment for it applies with full vigor to the trial of a single count of a single indictment. *The full flowering of the purpose of this rule of English practice was a reaction to the excesses of prosecution-minded Royalist judges,* such as the legendary "Bloody Jeffreys," during the period of the "Bloody Assizes," as the Crown relentlessly pursued the rebels involved in the ill-fated Duke of Monmouth's Rebellion. *The particular excess to be guarded against was the tendency of the Crown, acting either through the prosecutor or the judge or both, to sabotage a trial that was going badly for the Crown so the prosecution could regroup and live to fight another day.*

Justice Stevens explained, in *Arizona v. Washington*, 434 U.S. 497, 507–08, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), the historic abuse to which the law was a reaction.

[T]here was a time when English judges served the Stuart Monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict.

The original problem, ironically, had been not so much prosecutorial overreaching as it was judicial overreaching. See Friedland, *Double Jeopardy,* 13–14, 21–25 (1969); Sigler, *Double Jeopardy,* 87 (1969).

The evil represented by a mistrial 1) requested by the prosecutor or 2) declared, *sua sponte,* by the judge is that it takes away from the defendant the decision of whether to let the trial go forward. Even in the face of reversible error, the defendant, for a variety of reasons, may wish to go forward. It is the protection of this right to keep the tribunal together that is at the very heart of mistrial/retrial law. In *West v. State,* 52 Md.App. at 637, 451 A.2d 1228, we explained how, even in the face of reversible error, this is a valuable right.

> Even after error has been injected into a case, *a defendant may prefer* not to abort the trial, but *to wait and see whether he may not achieve an acquittal even in the teeth of prejudicial error. An appeal is still available if the gamble fails.* The defendant still maintains control. *A skillful,* counterpunching defense *tactician may,* moreover, *turn flagrant prosecutorial misconduct to his advantage and wrest from an outraged jury an acquittal precisely because of that misconduct.* There is a significant defense interest in keeping the trial upon the tracks quite apart from the interest in receiving a fair trial.

(Emphasis supplied).

In *United States v. Jorn,* 400 U.S. 470, 484–85, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), the Supreme Court explained the advantages of being able to keep a tribunal, once empaneled, together to the sweet or bitter end.

> [T]he crucial difference between reprosecution after appeal by the defendant and reprosecution after a *sua sponte* judicial mistrial declaration is that *in the first situation the defendant has not been deprived of his option to go to the first jury and, perhaps, end the dispute then and there with an acquittal.* On the other hand, where the judge, acting without the defendant's consent, aborts the proceeding, the

defendant has been deprived of his "valued right to have his trial completed by a particular tribunal."

If that right to go to a particular tribunal is valued, it is because, independent of the threat of bad-faith conduct by judge or prosecutor, *the defendant has a significant interest in the decision whether or not to take the case from the jury* when circumstances occur which might be thought to warrant a declaration of mistrial.

(Emphasis supplied).

It is precisely because of this energizing purpose of mistrial/retrial law—the purpose of keeping the decision of whether to abort the trial in the control of the defendant, even in the face of error—that a pivotal question is always that of: "Who asked for the mistrial?"

### Who Asked for the Mistrial?

The key to the analysis of any mistrial/retrial problem must begin with the critical question, "Who asked for the mistrial?" As we round up the usual suspects, there are only three—the prosecuting attorney, the defense attorney, and the trial judge. Because the energizing purpose of mistrial/retrial law is to protect a defendant's right to have the trial completed by the tribunal that was originally empaneled to try him, the traditional villains have always been 1) the prosecutor who requests the mistrial and 2) the judge who, *sua sponte,* declares a mistrial. Most of mistrial/retrial law concerns situations wherein the mistrial has been sought by the prosecutor or declared, *sua sponte,* by the judge, with the critical inquiry being whether there was a "manifest necessity" for the resulting mistrial. *Fields v. State,* 96 Md.App. at 733–34, 626 A.2d 1037, explained this familiar posture of most mistrial/retrial questions.

There are three key players involved in every trial: the judge, the prosecutor, and the defendant (directly or through his agent, the defense attorney). *In terms of the Machiavellian employment of the mistrial device deliberately to sabotage a trial perceived to be going badly for the prosecution, the historic culprits were the judge and the*

*prosecuting attorney. When,* therefore, *a mistrial is declared, over the objection of the defense,* either at the request of the prosecutor or *sua sponte* by the judge, the rule provides that *no retrial will be permitted unless there was a "manifest necessity" for the mistrial.* When that is the posture of the mistrial analysis, a substantial body of law is available exploring every nuance of what is and what is not "manifest necessity." *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949); *Gori v. United States,* 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

(Emphasis supplied).

### A Horse of a Different Color

In a situation wherein, by contrast, the mistrial is requested by the defendant, the analysis is radically different. In *Oregon v. Kennedy,* 456 U.S. 667, 672, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the Supreme Court highlighted the difference.

But *in the case of a mistrial declared at the behest of the defendant, quite different principles come into play.* Here the defendant himself has elected to terminate the proceedings against him, and the "manifest necessity" standard has no place in the application of the Double Jeopardy Clause.

(Emphasis supplied).

In *United States v. Dinitz,* 424 U.S. 600, 607, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), the Supreme Court had earlier noted, "Different considerations obtain, however, when the mistrial has been declared at the defendant's request." The *Dinitz* Court went on to note:

The distinction between mistrials declared by the court *sua sponte* and mistrials granted at the defendant's request or with his consent is wholly consistent with the protections of the Double Jeopardy Clause.

424 U.S. at 608, 96 S.Ct. 1075. See also *Lee v. United States,* 432 U.S. 23, 32–33, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977).

In *West v. State,* 52 Md.App. at 630–31, 451 A.2d 1228, this Court contrasted the two very different analytic perspectives, depending upon the identity of the moving party:

> [T]hose situations appear in two essential postures. The first is where the mistrial has been declared by the judge *sua sponte* or at the request of the State, either over the objection of the defendant or at least without the explicit acquiescence of the defendant. In those situations, the rule is that if there was a manifest necessity for the mistrial, retrial will not be barred. *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). That situation is not the one before us.
>
> *The other essential posture,* and the one that is before us, *is where the mistrial is declared at the request of the defendant. Ordinarily, a defense request for a mistrial is treated as a waiver of any double jeopardy claim. United States v. Tateo,* 377 U.S. 463, 467, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *United States v. Dinitz,* 424 U.S. 600, 607–608, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976).

(Emphasis supplied). And see *Thompson v. State,* 38 Md.App. 499, 502, 381 A.2d 704 (1978) ("[A] request by a defendant for a mistrial ordinarily removes any bar to reprosecution even though the motion was necessitated by prosecutorial or judicial error."); *Loveless v. State,* 39 Md.App. 563, 565, 387 A.2d 311 (1978) ("Subject to the narrow exception yet to be discussed, it is axiomatic that a defendant who has moved for a mistrial waives, by that very motion, all objection to a subse-

quent retrial."); *Tabbs v. State,* 43 Md.App. at 23–25, 403 A.2d 796.

## The Limited Exemption From The Foreclosing Effect of Waiver

To place the contention in this case, and all similar contentions, in context, the almost invariable rule is that a defendant who has requested and received a mistrial has waived any objection to a subsequent retrial. The notion of a limited exemption from that otherwise foreclosing effect of waiver first appeared in several Supreme Court cases as a tender shoot of dicta. A footnote in *United States v. Tateo,* 377 U.S. 463, 468 n. 3, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964), observed:

If there were any intimation in a case that prosecutorial or judicial impropriety justifying a mistrial resulted from a fear that the jury was likely to acquit the accused, different considerations would, of course, obtain.

Also by way of dicta, *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), and *United States v. Dinitz,* 424 U.S. 600, 607–08, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), made reference to the earlier footnote in *Tateo* but elaborated on it to the extent of characterizing the exemption from waiver as something arising out of a defense mistrial request necessitated by "prosecutorial or judicial overreaching." The phrase was instantly contagious.

Even though there had never been a holding touching on the subject, let alone the reversal of a conviction, the appellate mills were soon glutted with issues of what varieties of judicial or prosecutorial misconduct might constitute "overreaching." The term "overreaching" became a mantra. This Court, in *Tabbs v. State,* 43 Md.App. 20, 403 A.2d 796 (1979), was at the very front of the national curve in moving to contain what was threatening to become a doctrinal epidemic. Our analysis in *Tabbs* was picked up and became the heart of the State of Oregon's ultimately successful brief in *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

### Oregon v. Kennedy

The prosecutorial error that provoked the defense motion and the ultimate declaration of a mistrial in *Oregon v. Kennedy* was infinitely more egregious and more prejudicial than the pallid error, if error it was, in the case at bar. Kennedy was on trial for the theft of an oriental rug, with commercial deception as a key issue. On the redirect examination of an expert witness, the prosecutor tried repeatedly to show why the witness distrusted the defendant, but the trial judge sustained a series of defense objections to the entire line of inquiry. The critical exchange then followed:

Prosecutor: Have you ever done business with the Kennedys?

Witness: No, I have not.

Prosecutor: *Is that because he is a crook?*

456 U.S. at 669, 102 S.Ct. 2083 (emphasis supplied). Without waiting for the answer, the judge immediately granted the defense motion for a mistrial.

When the prosecution later sought to retry Kennedy, the defense interposed the plea in bar of double jeopardy. The trial judge, however, found that "it was not the intention of the prosecutor in this case to cause a mistrial" and refused to bar a retrial. The Oregon Court of Appeals reversed, buying into Kennedy's double jeopardy claim. The Supreme Court of the United States summarized the reasoning of the Oregon Court of Appeals.

The Court of Appeals accepted the trial court's finding that it was not the intent of the prosecutor to cause a mistrial. Nevertheless, *the court held that retrial was barred because the prosecutor's conduct in this case constituted what it viewed as "overreaching."* ... This personal attack left respondent with a "Hobson's choice-either to accept a necessarily prejudiced jury, or to move for a mistrial and face the process of being retried at a later time."

456 U.S. at 670, 102 S.Ct. 2083 (emphasis supplied).

Dealing for the first time with mistrial/retrial law as a square holding, the Supreme Court slew the many-headed

Hydra of "overreaching." For the sake of convenience, we will confine our present analysis to the case of prosecutorial overreaching. The Supreme Court made it very clear that, as an exemption from waiver by a defendant who asks for a mistrial, prosecutorial overreaching is a necessary condition, but it is by no means a sufficient condition. Although it is necessary, as a threshold matter, that the prosecutor do something both erroneous enough and prejudicial enough to justify the declaration of a mistrial, the very happening of the mistrial is ordinarily a sufficient sanction for such prosecutorial error. The barring of a retrial adds an entirely new dimension to the sanction, one that is available only in the rarest of circumstances.

What is critically necessary for the imposition of that additional sanction is not error and prejudice, but a particular intent or purpose. The Supreme Court pointed out that trial error is a commonplace and that, ordinarily, it can be handled by appellate reversal or by the mistrial itself.

> *Every act on the part of a rational prosecutor* during a trial *is designed to "prejudice" the defendant* by placing before the judge or jury evidence leading to a finding of his guilt. Given the complexity of the rules of evidence, *it will be a rare trial* of any complexity *in which some proffered evidence* by the prosecutor or by the defendant's attorney *will not be found objectionable by the trial court.*

456 U.S. at 674–75, 102 S.Ct. 2083 (emphasis supplied).

■■■■■ Even when reversible error has occurred, the decision of a defendant to seek a mistrial is ordinarily a waiver of any objection to a retrial.

> *Prosecutorial conduct that might be viewed as* harassment or *over-reaching,* even if sufficient to justify a mistrial on defendant's motion, therefore, *does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.* A defendant's motion for a mistrial constitutes "a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." *Where*

*prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, "[t]he important consideration,* for purposes of the Double Jeopardy Clause, *is that the defendant retain primary control over the course to be followed in the event of such error."*

456 U.S. at 675–76, 102 S.Ct. 2083 (emphasis supplied).

■ The only exemption from such a waiver is the situation in which the prosecutor deliberately committed the error with the specific intention of "goading" the defendant into asking for the mistrial.

*Only where the* governmental *conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy* to a second trial after having succeeded in aborting the first on his own motion.

456 U.S. at 676, 102 S.Ct. 2083 (emphasis supplied).

■ The holding of the Supreme Court was crystal clear: no prosecutorial overreaching will bar a retrial, following a defense request for a mistrial, unless the prosecutor deliberately intended to provoke such a request. Given the finding that the Oregon prosecutor did not so intend, the retrial in *Oregon v. Kennedy* should not have been barred.

[W]e do hold that *the circumstances under which such a defendant may invoke the bar of double jeopardy* in a second effort to try him *are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.*

Since the Oregon trial court found, and the Oregon Court of Appeals accepted, that the prosecutorial conduct culminating in the termination of the first trial in this case was not so intended by the prosecutor, *that is the end of the matter.*

456 U.S. at 679, 102 S.Ct. 2083 (emphasis supplied). And see Judge Hollander's analysis of *Oregon v. Kennedy* in *Hagez v. State,* 131 Md.App. at 424–28, 749 A.2d 206. At 131 Md.App. 409, 749 A.2d 206, Judge Hollander drew a distinction between

acting "deliberately in an effort to abort the trial" and acting "zealously in an effort to secure a conviction."

In *West v. State*, 52 Md.App. at 625, 451 A.2d 1228, this Court took due notice of the now controlling criterion:

*Is the overreaching conduct that will bar a retrial*, following a mistrial which circumstances have forced a defendant to request, *limited to the deliberate derailment of a trial in progress* or does it also embrace such other misconduct as the insinuating of error into the trial either (1) through gross negligence or (2) consciously, but with a design to win the trial rather than to abort it? In a holding anticipated by this Court and, in significant measure, by the Court of Appeals, *the Supreme Court* in *Oregon v. Kennedy has now unequivocally resolved that it is only the deliberate derailing that will engage the gears of the double jeopardy machinery.*

(Emphasis supplied).

In *Thanos v. State,* 330 Md. 576, 588, 625 A.2d 932 (1993), Chief Judge Robert Murphy stated unequivocally for the Court of Appeals:

The idea behind this exception is that the government should not be able to orchestrate a second chance for a conviction if it determines that acquittal is likely in the first trial. The Court in *Kennedy* emphasized, however, that *the prosecution must intend to coax a mistrial for double jeopardy to bar further proceedings. Conduct amounting to simple "harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion," is not enough.*

(Emphasis supplied). See also *Bell v. State,* 286 Md. 193, 207, 406 A.2d 909 (1979) ("We cannot say that the trial court was clearly wrong in concluding that the prosecutor did not want or deliberately seek a mistrial.")

In *Fields v. State,* 96 Md.App. at 746, 626 A.2d 1037, we amplified the definition of intentional goading, explaining it as the act of deliberately "sabotaging a trial that is going badly."

This is what "prosecutorial or judicial overreaching" means. *It is the deliberate commission of error for the*

*specific purpose of sabotaging a trial that is going badly for the State so that the State may have another opportunity to do better.* It interferes with a defendant's right to keep his tribunal, once empaneled, together to the sweet or bitter end by goading him or provoking him into asking for the declaration of mistrial in the expectation that his agreement to the mistrial will then estop any future double jeopardy claim.

(Emphasis supplied).

In *Tabbs v. State,* 43 Md.App. at 35, 403 A.2d 796, we focused on the "motivation and purpose" of the prosecutor in committing the error that prompted the defense request for a mistrial.

It is clear that *it is not the fact of error* itself nor the impact of the error upon the defendant's fortunes *that controls* in the defense-requested-mistrial/retrial situations, *but rather the motivation and purpose that prompted an intentional commission of error.*

(Emphasis supplied).

It was in *Bell v. State,* 41 Md.App. 89, 101, 395 A.2d 1200 (1979), that Judge Lowe concluded:

*Whether the misconduct here was grossly negligent or intentionally perpetrated tactically to gain a trial advantage is of no consequence* to the question of retrial. *It was not intended to provoke a mistrial,* but was, at worst, an intentional foul to win the trial then in progress.

(Emphasis supplied). See also *Hagez v. State,* 131 Md.App. at 444, 749 A.2d 206 ("[I]t is evident that the prosecutor's improper conduct at trial was not prompted by a desire to 'sabotage a probable loser.' "); *Loveless v. State,* 39 Md.App. at 566, 387 A.2d 311 ("The only time that retrial is barred under double jeopardy principles is when there has been such prosecutorial or judicial overreaching as to have amounted to a deliberate and intentional sabotaging of the earlier trial."); *Harris v. State,* 312 Md. 225, 240 n. 7, 539 A.2d 637 (1988); *Booth v. State,* 301 Md. 1, 8, 481 A.2d 505 (1984) ("[A]pplying the principle of *Oregon v. Kennedy,* we see no action by the

state which in any sense could be viewed as an intention to goad the appellant into seeking a mistrial or that the state was seeking to abort the trial.").

For all other error, the law has provided stern and sufficient sanctions, as this Court pointed out in *Loveless v. State,* 39 Md.App. at 565–66, 387 A.2d 311.

> Except in those rare instances where the prosecution or the court has deliberately sabotaged a trial that was going badly, *the available redress where an irremediable error is recognized in mid-trial is the declaration of a mistrial* followed by a retrial; *the available redress where a reversible error has occurred in a trial which runs its full course* and results in a conviction *is a reversal followed by a retrial.*

(Emphasis supplied).

### The Mistrial at Issue

Against this doctrinal backdrop, we may view the declaration of mistrial before us. As trial began on July 6, 2004, a sensitive nerve was touched early in the prosecutor's opening statement to the jury. The multi-count indictment charged, *inter alia,* 1) possession with intent to distribute and 2) simple possession. From the outset, the appellant essentially admitted his guilt of simple possession, but strongly denied the incremental charge of commercial distribution. That distinction brought into prominence the search warrant that had authorized the August 8, 2003 search of the Set It Off store, owned and operated by the appellant in Ocean City.

The prosecutor began his opening statement by attempting to describe, "briefly," the provenance of the case. Delivering an opening statement, however, can be as daunting as writing an epic. It is the age-old literary problem of how best to tell a story. Lacking Dante's talent for launching into *The Divine Comedy in medias rea,*[3] the assistant state's attorney could

---

**3.** "In the middle of the course of my life, I found myself in a dark wood."

only, even as Dickens's *David Copperfield,* begin at the beginning.[1] Once upon a time,

> [i]n June of 2003, Detective Heiser, who is with the Ocean City Police Department, received information and began an investigation of drug distribution in the Ocean City Northern, Worcester County area. *The target of that investigation—.*

(Emphasis supplied).

In the wake of an immediate defense objection, a bench conference was convened.

> [Defense Counsel]: Your Honor, the search and seizure warrant has never been evidence since I've been practicing law and probably since you've been practicing law. I think the State is now poisoning the well in telling them about a drug distribution that they're never going to hear unless the State intends to call the informant to testify. This is improper. It's inexcusable, and I'm shocked that this seed has been planted.
>
> [Prosecutor]: Your Honor, *I am simply giving the jury background that they began an investigation. As a result of that investigation, they obtained a search warrant.* I'm not going into the facts of what—how they obtained it, but *this did not fall out of the clear blue sky. They have to have—*
>
> [The Court]: *Well, there's nothing wrong with that.*
>
> [Prosecutor]: *—some brief preparatory remarks.*
>
> [The Court]: If that's as far as you take it.
>
> [Prosecutor]: That's correct.
>
> [Defense Counsel]: I'm not concerned about Mr. Collins, with all due respect, taking it anywhere. And I truly respect him. *I'm worried about the police officers now coming in and testifying,* based upon their investigation and a search and seizure warrant, that they're going to testify—

---

**4.** "Beginning my life at the beginning of my life, I record that I was born."

[The Court]: Here's what we'll do. After opening statements, I usually give the jury a break. They've been out there a long time. At that point in time—

[Prosecutor]: I will instruct my officers.

[The Court]: Is that okay? He could do it himself.

[Defense Counsel]: Judge, sometimes it's very difficult now to cure a problem which shouldn't have been broached to begin with.

[The Court]: No, it isn't.

[Defense Counsel]: *This jury knows that there was an investigation ... [and] a search and seizure warrant.*

[The Court]: *There's nothing wrong with that.*

[Defense Counsel]: I don't see—

[The Court]: If he was going to go into—he didn't quite get there. But *if he's going to go into,* you know, *your client being a target of an investigation because he distributed to some informant* or something, yeah, that's—*we got a real problem* then. *But he didn't get there because you objected.*

[Defense Counsel]: Judge, I think this would be an appropriate time for you to admonish the jury and have Mr. Collins start all over.

[The Court]: What do you want me to admonish the jury about?

[Defense Counsel]: That *all of his statements up to this point should be disregarded.*

[The Court]: *No. They all shouldn't be disregarded.*

[Defense Counsel]: *About the search and seizure warrant and an investigation.*

[The Court]: *That's coming in. They've got to say why they're there. They're going to say they have a search and seizure warrant.* As far as the contents of the warrant, we're going to have to depend upon—I'll do it myself if you want me to. I'll bring the officers in and tell them myself.

[Defense Counsel]: I'm not sure what that that's going to cure the problem, Judge.

. . . .

[The Court]: What you're saying is that any case where there's a search warrant you can't try the case or something? I don't know what you're saying.

[Defense Counsel]: *The jury already knows there's a major investigation going on.*

[The Court]: *Nothing wrong with that.*

[Defense Counsel]: And there's a search and seizure warrant issued for my client. What other inference could they possibly draw?

[The Court]: *That is coming in anyway.*

[Defense Counsel]: *No, it isn't.*

[The Court]: *Yes, it is.*

[Defense Counsel]: *No, it isn't.*

[The Court]: *Well, you can object.*

[Defense Counsel]: With all due respect, I don't believe it's going to, Judge.

[The Court]: Well, we'll see.

[Defense Counsel]: I would take exception to your ruling. And I think—

[The Court]: Well, you should have filed something, a motion in limine. *I never heard of a case where the police couldn't say they went in armed with a search and seizure warrant.*

[Defense Counsel]: I've never heard—with all due respect to Mr. Collins, I'm shocked that he would—knowing—knowing the law that he knows, that he would even comment on that because that has no bearing in this case.

[The Court]: All right.

[Defense Counsel]: It has no bearing in this case.

[The Court]: All right. If this is—is this a motion? What is this you're making, a motion—

[Defense Counsel]: I guess I'm making a motion in limine.

[The Court]: All right. *That motion is denied. I have no idea what's going to transpire here today.* You can make it again at the appropriate time, and I'll rule on it.

[Defense Counsel]: Yes, Your Honor.

(Emphasis supplied).

The assistant state's attorney, who had been little more than a passive auditor of that disagreement between judge and defense counsel, attempted to resume. After an opening sentence explaining that the lead detective "began an investigation of drug distribution in Worcester County of the defendant," another objection cut short the thought. That objection was overruled.

The assistant state's attorney attempted to pick up the narrative for the third time.

[Prosecutor]: The defendant operated a retail store called Set It Off, which is at the corner of Talbot and Baltimore Avenues in Ocean City, Maryland.

After a several-week investigation, the officers applied for and received a search warrant to search the Defendant and his store.

The rhythm was again broken.

[Defense Counsel]: *Objection,* Your Honor.

[The Court]: It's noted. *It's overruled.*

[Prosecutor]: Thank you, Your Honor.

[The Court]: Go ahead.

(Emphasis supplied).

For yet a fourth time, the assistant state's attorney attempted to start his story of the case.

On Wednesday, August 8th of 2003, officers of the Ocean City Police Narcotics Division executed that search warrant at the Set It Off store. The Defendant was present. The officers will identify him.

Officer Heiser, who's seated there at the State's table—

Yet another objection triggered yet another bench conference.

[Defense Counsel]: Your Honor, my theory of the case and the defense's theory in this case is that my client is not a

distributor, and by the very nature of the fact that it was a large quantity of drugs doesn't make him a distributor.

Number two, the State now has planted this seed that there's a major investigation going on down here, and as a result of that investigation, a search and seizure warrant is issued by an issuing judge and they go to his establishment.

Judge, this is grossly—

[The Court]: *What's your suggestion, then, just so the record is clear on this? You don't want any mention of the search and seizure warrant?*

*Because I never said he couldn't mention that there was a search and seizure warrant.*

*You're making much more of this than what there is to it ... Certainly they can say why they were there. What are you supposed to do, remain silent as to why they were there? They just went in there and started searching?*

[Defense Counsel]: Why don't we pick it up at the point that there's a search and seizure warrant, not why there was a warrant, because it looks like—

[The Court]: Because you can't tell the State how to present their case any more than they can tell you.

[Defense Counsel]: *It gives the jury the impression that, as a result of this investigation, a search—*

[The Court]: *That's true.*

[Defense Counsel]: *—and now they found drugs.*

[The Court]: *Well, that's true, isn't it ... They're certainly entitled to say why they were there and why they searched.* He's not going to go into—I will not allow the particulars of some—because I've never seen the search warrant. I assume maybe there was a controlled buy or something like that. I don't know. Or somebody had been there and seen drugs in the past. *None of that is going to be allowed. But if it is, ask for a mistrial. I'll consider it.*

[Defense Counsel]: *I'm going to ask for a mistrial right now,* Your Honor.

[The Court]: *All right. That's denied* unless you want—I assume based on what you've already told me.

[Defense Counsel]: Based upon what I've told you.

[The Court]: Okay. That's denied.

(Emphasis supplied).

At long last, the State was allowed to finish its opening statement. The defense opening statement was, more gallantly, uninterrupted. After the jury was given a brief recess, the judge called before him all prospective police witnesses.

Folks, there was a motion in limine made. There's also a motion for a [mistrial]. *The Defense Counsel is concerned that when you testify that you're going to go beyond more than saying that you were doing an investigation in Ocean City, and you applied for or [were] granted a search and seizure warrant and served it.* What he specifically doesn't want you to say is anything that's within the confines of that search warrant. Bear in mind, I haven't seen it at all. But I assume there's something in there about either some informant or a controlled buy or something—usually there's something like that in there. None of that is to come in during this trial because that person is not here. And if it does, of course it will be the subject of a motion for a mistrial. Does that satisfy you, [defense counsel]?

[Defense Counsel]: Yes, it does, Your Honor. Thank you.

(Emphasis supplied).

The judge turned finally to the assistant state's attorney.

Before the jury is brought back in, I just want to make it clear on the search warrant. I don't see where it's necessary to say—I don't even know if this was a major one or not, but—a drug investigation. But *just simply say, his investigation, he applied for a search and seizure warrant, and then you went in and served it and take it from there.*

(Emphasis supplied).

The very first State's witness was Detective Jeffrey Heiser. The direct examination began.

[Prosecutor]: Detective Heiser, would you state your name and employment please.

[Witness]: Detective Heiser. I'm currently assigned to the Ocean City Vice Narcotics Unit.

[Prosecutor]: How long have you been so assigned?

[Witness]: Two an a half years.

[Prosecutor]: And pursuant to those duties, *did you begin a drug investigation in June of last year?*

[Witness]: Yes, sir, I did.

[Prosecutor]: *Who was the target of that investigation?*

[Defense Counsel]: *Objection,* Your Honor.

[The Court]: *Sustained.*

[Defense Counsel]: Your Honor, may we approach, please?

[The Court]: Yes.

(Emphasis supplied).

At the bench conference that followed, the overarching mood was one of almost uncomprehending judicial exasperation with, to put it most gently, the lack of prescience on the part of the prosecutor.

[The Court]: *I thought we went through this.*

[Prosecutor]: Your Honor, *I asked him this in opening statement and the objection was overruled.*

[The Court]: *Not about him being the target of the investigation.*

(Emphasis supplied).

Although the assistant state's attorney may, indeed, have failed to grasp the larger message, he was, we note, literally correct about having used, in opening statement, the word "target," just before the first objection was made and then overruled. Immediately prior to the objection, his truncated sentence had begun, "The *target* of that investigation...." (Emphasis supplied). This will become important when we come to evaluate whether the prosecutor deliberately did something wrong, even before turning to the follow-up issue of whether the prosecutor deliberately did something wrong for

the specific purpose of goading the defense into asking for a mistrial in order to sabotage a trial that was going badly for the State. An innocent mistake, even a stupid mistake, does not so much as jiggle the mistrial/retrial seismograph.

As the defense motion for a mistrial was granted, however, it was the assistant state's attorney who was in the unfortunate position of having been the deck officer who had failed to spot the iceberg.

[Defense Counsel]: Your Honor, *I'm going to renew my motion for a mistrial.*

[The Court]: *I'm going to grant it.*

[Prosecutor]: Your Honor.

[The Court]: I'm granting it. *That is ridiculous what you just did. Jesus, we've had now three discussions over this.*

(Emphasis supplied). The jury was dismissed. Even as we described a similar catastrophe in *West v. State,* 52 Md.App. at 630, 451 A.2d 1228, "Hard by the bow at 11:58 a.m., the initial jeopardy went to the bottom."

### A Ruling Must Abide An Issue To Be Ruled Upon; All Else Is Only Comment

In the lifeboats, accusations and recriminations may abound. Notwithstanding the inevitability of a spirited post-mortem, however, there is at such a moment no double jeopardy issue before the court. As an issue, it is not yet ripe and, indeed, may never become ripe. The termination of initial jeopardy does not necessarily presage the imminence of double jeopardy. The court, therefore, may not make an anticipatory ruling on a hypothetical double jeopardy plea any more than it may make anticipatory rulings on what evidence may come in or on what jury arguments will be permitted at some purely hypothetical future trial that may never come to pass.

There is no double jeopardy issue before the court unless and until the State's Attorney actually decides to retry the case and then moves officially to put that decision into operation. There is always a very real possibility that he might choose not to do so. Even then, there is no double jeopardy

issue before the court unless and until the defendant actually interposes the plea in bar of double jeopardy. It is conceivable that, for a variety of reasons, he might choose not to do so.

The actual issue of double jeopardy in this case arose only 1) when the State, on July 8, 2004, requested that the case be docketed for retrial; and 2) when the appellant, on July 23, then interposed the plea in bar of double jeopardy. The issue of double jeopardy was argued before Judge Groton on September 13 and ruled on by him on September 16. That is the only ruling that concerns us on this appeal. It is, moreover, the only actual ruling that was made in this case.

The post-mortem thoughts of the trial judge, by contrast, although having no legally binding significance, may nonetheless have very real evidentiary significance. They were offered before Judge Groton as pertinent evidence on the critical question of prosecutorial purpose. Considered by Judge Groton was the July 8 letter of the trial judge to both the appellant's attorney and the prosecutor.

I thought I should write this letter to avoid any confusion regarding my comments concerning "prosecutorial misconduct." *My comments were not meant to be an Order of this Court or the equivalent of an Order. It is my opinion that the State can set this case back in for trial and that the Defendant can raise this issue before the judge hearing the case, once it is reassigned.* I believe the State and the Defendant are both entitled to a hearing on the issue of "prosecutorial misconduct."

I have reviewed the transcript and *the issue of the Defendant being the "target" of the investigation. This was mentioned by [the prosecutor] and I did overrule the Defendant's objection.* However, after several bench conferences, *I thought I made it clear* on page 18 of the transcript, beginning at line 11, *the expected limits of the testimony regarding the search warrant. If this was misunderstood by [the prosecutor] (and it may have been) it would not be prosecutorial misconduct, barring further prosecution.*

I, by copy of this letter to the Assignment Clerk, will direct that this case be calendared for another judge, in the event the State seeks to retry the Defendant.

(Emphasis supplied).

### The Double Jeopardy Ruling

In denying the appellant's double jeopardy plea, Judge Groton found, at the threshold, that it was not clear that the prosecutor had even made a mistake.

*[I]t is unclear to this Court that* when questioning Detective Heiser, *the prosecutor knew his questions were objectionable.* Indeed, *even the presiding judge,* Judge Eschenburg, *clarified* in a letter to the parties, *that* under the circumstances, *the prosecutor may have misunderstood the boundaries that the Court established* regarding testimony about the search warrant.

(Emphasis supplied).

More significantly, the Opinion and Order of Judge Groton found that there was no evidence of goading on the part of the prosecutor or of any intent to sabotage a losing effort.

[T]his Court finds that *there is an absence of any evidence* tending *to indicate that the prosecutor in the case sub judice acted so as to "goad" the defendant into moving for a mistrial.* As Judge Moylan explained in *West v. State,* 52 Md.App. 624, 634, 451 A.2d 1228 (1982), the prosecutor must not only have the general intent to do an act (such as asking a prohibited question) but, "knowing it to be error," *he must act with the desire "to 'sabotage' a probable loser* either 1) by snatching an unexpected victory from probable defeat if not caught, or 2) by getting caught, thereby provoking the mistrial, averting the probable acquittal and living to fight again another day." As Judge Moylan summarized, *there must be a "calculated sabotaging of a perceived 'lost cause'* in either event; an indifference to whether he [the prosecutor] is caught or not."

In the case at bar, the Court finds that *the defendant has failed to reveal any evidence* or fact *indicating that the*

*prosecutor possessed this intent.* Preliminarily, the Court notes that the trial had just begun and it was not evident that the prosecutor's defeat was probable. Accordingly, *his case could not be fairly characterized as a "lost cause."*

(Emphasis supplied).

Indeed, at the hearing before Judge Groton, the prosecutor had pointed out what was self-evident in any event.

At that point, Your Honor, I didn't think I was going to lose. *The trial hadn't even hardly started yet.*

(Emphasis supplied).

Judge Groton's final ruling was unequivocal.

Thus, because *the defendant has failed to convince this Court that the prosecutor's acts amounted to "a calculated sabotaging" of the defendant's case;* and because the Court is not convinced the prosecutor even acted with the knowledge that his acts were in error, this Court finds that *the defendant's retrial is not barred by the Double Jeopardy Clause.*

(Emphasis supplied).

### Materiality of Prosecutorial Intent

In denying the motion, Judge Groton relied on the "absence of any evidence" that the prosecutor "acted so as to goad the defendant into moving for a mistrial." In challenging the ruling, the appellant wanders back and forth across and badly blurs the line between two completely different arguments. We have some difficulty pinning down precisely the argument that we are called upon to answer.

In one breath, the appellant seems to accept, as he must, that "prosecutorial intent [by definition, a subjective thing] is the determinative issue." He then argues that that prosecutorial intent may not be proved by the testimony of the prosecutor as to his subjective state of mind, but must be deduced from the objective conduct itself, to wit, from the behavior that caused the mistrial. Such an argument is not about the materiality of prosecutorial intent as the thing to be proved, but only about the modality of how to prove it.

In virtually every alternate sentence, however, the appellant segues into an entirely different argument. He seems to question the very materiality of prosecutorial intent as the critical criterion to be proved. He argues that the trial' circumstances must be viewed from the perspective of the defendant and the defense attorney, stressing that they cannot be expected to read the subjective state of mind of the prosecutor. The appellant argues that only the objective actions of the prosecutor are discernible to the defendant or defense attorney as they are called upon to respond to the prosecutor's misfeasance. This argument, in contrast to the first, has nothing to do with the method of proof, but calls into question the very materiality of the thing to be proved.

This second argument, however, we have already exhaustively disposed of in tracing the evolution of mistrial/retrial law. Mistrial/retrial law does not view the prosecutor's conduct from the perspective of the defendant or the defense attorney, however fervently the appellant might wish it were otherwise. Mistrial/retrial law is not concerned with **WHAT** the prosecutor did, but only with **WHY** he did it. This does not mean, of course, that the law itself is indifferent to trial error generally. It may be sternly redressed, but in other ways. As we explained in *West v. State,* 52 Md.App. at 636, 451 A.2d 1228:

> The redress is the declaration of the mistrial itself or the appellate reversal of the conviction. Many of the prosecutorial errors that trigger mistrials and reversals consist of grossly negligent and even deliberate conduct. *The law has never looked upon the declaration of a mistrial and the appellate reversal as mild slaps upon the wrist, but has treated them as rigorous means for redressing even grossly negligent and deliberate misconduct.* For weighty considerations that need not here be reiterated, *our constitutional law has always permitted a retrial following such mistrial or reversal.*

(Emphasis supplied).

The incremental sanction of barring a retrial, however, is reserved for the unique situation in which it is the subjective

intention of the prosecutor to goad the defendant into request-
ing a mistrial, the deliberate effort by the prosecutor to derail
or to sabotage the trial in progress. We explained in *West v.
State*, 52 Md.App. at 636, 451 A.2d 1228, why this unique
sanction is reserved for this unique prosecutorial *mens rea*.

> When the prosecution suffers a mistrial or an appellate
> reversal, it is considered to have suffered a stern rebuke in
> terms of lost days, lost dollars, lost resources of many
> varieties and the lost opportunity to make the conviction
> stick. *It is only* in the Machiavellian situation *where the
> prosecutor deliberately courts a mistrial, that the normal
> sanctions are self-evidently inadequate. A scheming prose-
> cutor cannot be rewarded by being handed the very thing
> toward which he connives.*

> A defendant may well ask what difference it makes to him
> why the error was committed, since he suffers all the same.
> The answer is that *from the parochial viewpoint of the
> defendant, it may make very little difference; but the
> defendant is not the only factor in the equation.*

(Emphasis supplied).

The defendant and the defense attorney, therefore, do not
need to know **WHY** the prosecutor did what he did, because it
is not their job to make that call. The determination of
whether to impose the incremental sanction of barring a
retrial is reserved exclusively for the judge who is called upon
to make the ultimate ruling on the double jeopardy plea.
What matters to him is not **WHAT** happened, but **WHY** it
happened. In *West v. State*, 52 Md.App. at 637, 451 A.2d
1228, we explained:

> *Even at the extreme end of the reprehensibility spectrum,*
> however, where the prosecutor has committed the deliber-
> ate foul, *there is still this pivotal distinction* between (1)
> seeking to win the game unfairly and (2), knowing the game
> is going awry, deliberately causing it to be cancelled and
> rescheduled. *If the prosecutor wins the game unfairly, we
> make him replay it. When the prosecutor deliberately*

*causes the game to be cancelled unfairly, we do not permit him to reschedule it.*

(Emphasis supplied).

### Relevant Evidence of Prosecutorial Intent

Having established, hopefully, that prosecutorial intent is, indeed, the material criterion, we turn to the modality of its proof. The intent of the prosecutor in asking a question or in making an argument is a fact, which, like any other fact, may be established by relevant evidence. All of the circumstances surrounding the asking of the question or the making of the argument are relevant evidence of prosecutorial purpose. Also obviously relevant is the testimony or statement by the prosecutor himself as to precisely what, if anything, his intent may have been. His testimony, of course, may be taken with a grain of salt, but its relevance, as evidence, is not to be doubted. In an effort to convince us that Judge Groton's finding in this regard was clearly erroneous, the appellant argues that it was error *per se* for Judge Groton to have considered and partially to have relied upon the prosecutor's statement.

Out of a significant body of caselaw on this subject, the appellant has culled a single instance in which the adjective "objective" was used. From the unremarkable observation that intent may be inferred "from objective facts and circumstances," the appellant seeks to establish the converse principle that it may not be proved in any other way and that a statement from the prosecutor as to his subjective intent should not even be considered by the court in making its ruling.

The appellant ascribes to this Court, in *Fields v. State,* 96 Md.App. at 742, 626 A.2d 1037, a definitive statement as to the controlling standard of review that this Court is completely oblivious of ever having articulated. What the appellant reads into our thought process is, to say the least, truly Orwellian. In his brief, he attributes to us what he calls "the rule in *Fields,*" a rule that ostensibly establishes an exclusively "ob-

jective standard for judging prosecutorial misconduct." We, however, remain blissfully unaware of ever having announced any such rule. Although a work of art may arguably have meaning that the artist never consciously intended, this is definitely not so with judicial opinions.

Figuring out how the appellant could attribute to us a rule of law that we never remotely promulgated (and would, indeed, affirmatively reject) sheds interesting light, however, not so much on the legal phenomenon of opinion writing, as on the complementary phenomenon of opinion reading. Because of the peculiar nature of a legal system heavily based on court-made law, the very first semester of the first year of law school drums in the A, B, C's of how to read an opinion. Fundamental to the process is the distinction between an opinion's holding and its dicta (or, in this case, the random use of a word not even amounting to dicta). Every word of an opinion is not chiseled in marble. In *State v. Wilson*, 106 Md.App. 24, 36–37, 664 A.2d 1 (1995), *rev'd on other grounds, Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), we attempted to explain the difference.

The precedential weight of a holding is predicated in large measure on its status as the deliberate and considered judgment of an entire collegiate court, including the opinion writer, on the issue before it that must be decided. *Each member of an appellate court peers in with painstaking scrutiny not only on the decision itself but on the framing of the holding that announces the decision.* The articulation of the holding passes through a stern editorial process that insists that every "i" be dotted, every "t" be crossed, every word be carefully chosen, and every far-flung repercussion be sagely anticipated. *A holding, therefore, has earned the authoritative weight we give it.*

*The holding, however, consists of no more than a few sentences or, at most, a few paragraphs, generally located near the end of what may be a twenty or thirty-page opinion.* When it comes to the composition of the opinion leading up to the holding, the collegiate editorial reins are, although not totally relaxed, far looser. There is a wide

stylistic range within which the opinion writer may freely express a particular legal philosophy; a special analytic approach to problem solving; possibly idiosyncratic reactions to certain arguments; or, above all, an individualistic writing personality. *The active collegiate participation in the formulation of a holding retreats to gentle stylistic suggestion when it comes to the writer's modality of expression.* It is not uncommon for a panel member to subscribe to an opinion, notwithstanding an occasional wince of pain or smile of indulgent tolerance along the way. *The point is that everything said in an opinion—the dicta—is not entitled to the same weight as is the holding of the Court.*

(Emphasis supplied).

In crediting this Court with a rule of law that was never contemplated by us, the appellant confected such a rule from even less than dicta, from the appearance of a single word in a quotation from someone else. In pointing out that *Oregon v. Kennedy* had "made it clear that the exclusive focus was not on the fact of prosecutorial (or judicial) error or on the impact of such error upon a defendant but only on the intent of the prosecutor (or judge) in committing the error," this Court, in *Fields,* 96 Md.App. at 742, 626 A.2d 1037, had quoted the following passage from *Oregon v. Kennedy,* 456 U.S. at 675, 102 S.Ct. 2083:

By contrast, a standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply. It merely calls for the court to make a finding of fact. *Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process* in our criminal justice system.

(Emphasis supplied).

One simply cannot extract from that statement a rule of law, as the appellant would have us do, that a trial judge's finding as to the prosecutor's subjective purpose is immaterial and should not be considered on appellate review. In the section of the opinion from which the quotation was lifted, *Oregon v.*

*Kennedy* was not even contrasting modalities of proof. It was contrasting, rather, 1) the narrow exception to the waiver rule, based on prosecutorial goading, with 2) a broader exception, being urged by Kennedy in that case, based on prosecutorial overreaching generally. The Supreme Court was explaining that a standard looking to prosecutorial intent was a workable standard because it was based on a mental fact that was capable of being proved. That was the only purpose for which we quoted that particular passage.

In *Oregon v. Kennedy* itself, moreover, testimony as to the prosecutor's subjective intention was accepted both by the trial judge and by every level of appellate review, the very thing the appellant now asserts that *Oregon v. Kennedy* forbade.

> *After a hearing at which the prosecutor testified, the trial court found* as a fact *that "it was not the intention of the prosecutor* in this case *to cause a mistrial."* On the basis of this finding, the trial court held that double jeopardy principles did not bar retrial.

456 U.S. at 669–70, 102 S.Ct. 2083 (emphasis supplied). That finding of fact as to the prosecutor's subjective intent became the predicate for the Supreme Court's ultimate holding.

> *Since the Oregon trial court found, and the Oregon Court of Appeals accepted, that the prosecutorial conduct culminating in the termination of the first trial* in this case *was not so intended by the prosecutor, that is the end of the matter* for purposes of the Double Jeopardy Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

456 U.S. at 679, 102 S.Ct. 2083 (emphasis supplied).

In his concurring opinion, Justice Powell also took specific note of the same testimony as to subjective intent.

> Finally, at the hearing on respondent's double jeopardy motion, *the prosecutor testified—and the trial found* as a

fact *and the appellate court agreed—that there was no
" 'intention . . . to cause a mistrial.' "*

456 U.S. at 680, 102 S.Ct. 2083 (emphasis supplied).

The appellant's entire line of argument hinges on the single appearance in *Fields v. State,* 96 Md.App. at 742, 626 A.2d 1037, of the word "objective." The argument's conclusion is that we, therefore, should ignore Judge Groton's finding as to prosecutorial intent and should proceed to make our own *de novo* finding on that question, ignoring as we do so, pursuant to our own ostensible mandate, any statement by the prosecutor with respect to his subjective intent. The linchpin of the argument is not that we, even if only in passing and in a totally different context, ourselves used the word "objective." We did not. It is that we quoted from the opinion of another court that, also only in passing and in another context, used the word "objective." In rejecting this strained and attenuated argument, we can only re-echo our earlier observation in *State v. Wilson,* 106 Md.App. at 39, 664 A.2d 1:

> *[S]tare decisis* is ill served if readers hang slavishly on every casual or hurried word as if it had bubbled from the earth at Delphi.

### An Ineluctable Conclusion

██ Even if there had been no statement by the prosecutor as to the total absence on his part of any subjective intent to goad the appellant into asking for the mistrial, the objective circumstances alone scream out the ineluctable conclusion that the prosecutor's arguably inept questioning of his very first witness was not an effort to "sabotage a probable loser." Judge Groton's finding was self-evident and unavoidable.

> Preliminarily, the Court notes that the trial has just begun and it was not evident that the prosecutor's defeat was probable. Accordingly, his case could not be fairly characterized as a "lost cause."

Detective Heiser was the State's very first witness. When the offending question was asked, he had not gotten beyond giving his name, rank, and serial number. Far from going

badly, the trial had barely begun. The State was ready to produce a warranted search of and seizure from the appellant's store that was not even contested. The search had produced "approximately 39 grams of cocaine, both crack and powder." The appellant was not even challenging the confession in which he told the searching officers, "I want to be adult about this. There's a bag of cocaine and a bag of crack in my bag under the counter." The State was ready to offer the expert testimony of a seasoned narcotics detective, who would have testified 1) that the street value of the recovered cocaine was approximately $4,000 and 2) that the amount of cocaine far exceeded that indicating personal use and, instead, indicated the intent to distribute. Far from being a probable loser, this case was a "lead-pipe cinch" as a probable winner. There would have been no conceivable reason to sabotage the trial.

This was precisely the sort of circumstance that Judge Orth found to have been decisive in *Bell v. State,* 286 Md. at 206, 406 A.2d 909.

At the time the mistrial was declared, the State had presented a strong case; there was no reason apparent in the record why it would want the trial aborted.

In *Oregon v. Kennedy,* the concurring opinion of Justice Stevens took note, 456 U.S. at 692, 102 S.Ct. 2083, of a decisive circumstance indistinguishable from the one before us in this case.

The isolated prosecutorial error occurred early in the trial, *too early to determine whether the case was going badly* for the prosecution.

(Emphasis supplied).

In *Fields v. State,* 96 Md.App. at 756, 626 A.2d 1037, a similar circumstance was held to be decisive in the decision not to bar a retrial.

*[T]here was no compelling motivation for the assistant state's attorney to seek to sabotage the trial. This was not a case that was "going down the tubes" for the State.* The robbery victim made an unequivocal identification in the courtroom of the appellant as one of the robbers. When the

police stopped the automobile occupied by the appellant and his codefendant, it bore the tag number that had been observed at the crime scene by the victim and provided to the police. Both the appellant and his codefendant were wearing clothing similar to that described by the victim. *Although victory can never be guaranteed, this was not a case that the State was likely to lose.*

(Emphasis supplied).

It is also worthy of note that when the trial judge granted the mistrial, the prosecutor objected and argued strenuously against the granting of the motion. This was a circumstance that Justice Powell deemed to be significant in his concurring opinion in *Oregon v. Kennedy*, 456 U.S. at 680, 102 S.Ct. 2083.

Moreover, it is evident from a colloquy between counsel and the court, out of the presence of the jury, that *the prosecutor not only resisted, but also was surprised by, the defendant's motion for a mistrial.*

(Emphasis supplied).

Self-evidently in this case, there was on the part of the assistant state's attorney no goading of the appellant into asking for a mistrial and no deliberate effort to sabotage a trial that was going badly in the hope of doing better the next time around. The appellant's request for the mistrial, therefore, operated as a foreclosing waiver of any subsequent double jeopardy claim.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**